IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 8, 2004 Session

## GORDON E. MORROW, JR. v. TAMMY LYNN (PUGH) MORROW

**Appeal from the Circuit Court for Wilson County**
**No. 4104 DVC     Clara Byrd, Judge**

_____

**No. M2003-02448-COA-R3-CV - Filed July 14, 2005**

_____

The husband filed for divorce after a marriage of over twenty-three years. The trial court granted the divorce to the wife on the ground of the husband's inappropriate marital conduct and divided the marital property equally between the parties. Because of the property division, and because the wife had more formal education than the husband, the court decided that she was not entitled to any alimony. The wife appealed. We modify the trial court's decree to eliminate the payment to the husband ordered as part of the property division. Because this modification serves the goal of self-sufficiency for the economically disadvantaged spouse, we affirm the denial of alimony. We also affirm the award of attorney's fees.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed as Modified**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which WILLIAM C. KOCH, P.J., M.S., and FRANK G. CLEMENT, JR., J., joined.

John Michael Garrett, Larry H. Hagar, Nashville, Tennessee, for the appellant, Tammy Lynn (Pugh) Morrow.

Shawn J. McBrien, Lebanon, Tennessee, for the appellee, Gordon E. Morrow, Jr.

**OPINION**

**I.**

Gordon "Buddy" Morrow and Tammy Lynn Pugh Morrow married in 1979. Their marriage produced two children, Lindsey, a daughter who was born in 1985, and Blake, a son who was born in 1988. On December 27, 2002, Mr. Morrow filed a Complaint for Divorce in the Circuit Court of Wilson County. The Complaint stated that "irreconcilable differences have arisen between the parties such that they can no longer live together as husband and wife." Mr. Morrow did not request child custody, but asked the court to equitably divide the marital property and the marital debts.

Ms. Morrow's Answer and Counter-Complaint for Divorce was filed on January 23, 2003. She claimed that her husband "has been guilty of such inappropriate marital conduct as renders cohabitation unsafe and improper." She asked for custody of the two children, child support, division of marital property, and either alimony *in futuro* or alimony *in solido*. Mr. Morrow had moved into a bonus room in the marital home just prior to filing for divorce. Several weeks after Ms. Morrow answered, he moved out of the marital home and into a duplex owned by his father.

The court conducted its first hearing in this case on February 19, 2003 and heard evidence as to the parties' income and expenses. At the conclusion of the hearing, the court ordered Mr. Morrow to pay $935 per month as *pendente lite* child support and alimony. Ms. Morrow subsequently filed a motion for an increase in support, and after a hearing the trial court increased support to $1,166 per month "as long as the daughter continues to reside with the mother." Several months of discovery followed, during which Mr. Morrow initially denied but finally admitted to an affair with another woman. He claimed, however, that the affair did not begin until after the parties separated.

## II. THE DIVORCE HEARING

The final hearing of this case took place over two days, beginning on July 16, 2003. The only witnesses to testify were the parties themselves and their Certified Public Accountant (CPA). There was little testimony as to grounds. Most of the testimony and all of the documentary evidence that was presented involved financial matters.

Ms. Morrow had earned an associates degree in business from Cumberland University, and then left school in order to marry. During the first years of the parties' marriage, she worked at Safeco Insurance Company. After their first child was born, the parties agreed that Ms. Morrow should leave her job to become a full-time mother and homemaker while Mr. Morrow provided all the financial support for the family. The proof showed that the parties were generous to their children. For example, they bought a $5,000 motorcycle for Blake and built a motorcycle racing track on their property for his use.[1]

Several years prior to the filing of the divorce complaint, Ms. Morrow took a job with the Wilson County Board of Education. That job paid about $8.60 an hour. She subsequently transferred into a job as a school secretary at Lebanon High School so she could be on the same schedule as her son and could work near him. That job paid $7.63 per hour. During the hearing, Ms. Morrow expressed an interest in going back to school so she could become either a licensed practical nurse, which would enable her to find a job paying about $12 per hour, or a registered nurse, which would pay about $28 per hour.

---

[1]One refreshing feature of this case was the ability of the parties to cooperate in matters of visitation and to give their children the freedom to come and go between the parties' residences as they wished.

Mr. Morrow only had a high school diploma, but had learned the construction trade from family members. The proof showed that he was a hard worker and a good provider. During the first few years of marriage, he worked for an insulation company. He later became a carpenter and operated his own home building and framing company, Buddy Morrow Construction. He was also involved in a partnership with his family that bought and sold real property. The couple was very successful at accumulating assets. The court found the net value of the marital estate to be almost $540,000.

The most valuable asset of the parties was the marital home in Lebanon, which Mr. Morrow built himself. The parties stipulated to an appraisal that valued the home and the five acres on which it sits at $302,000. The property was not subject to a mortgage or any other encumbrance. At the time of divorce, the parties also owned a duplex and two unimproved lots. The parties had differing views about the value of those properties. The trial court found the equity in the duplex to be $64,500 and the equity in the lots to be $15,873. Another substantial marital asset was a savings account holding $75,690 from sales of real property.

In order to adequately deal with the question of child support, and to a lesser extent with the question of alimony, the court had to determine Mr. Morrow's earning capacity and/or his income. The CPA submitted unaudited tax returns for 1999, 2000, and 2001. They showed the profits from Mr. Morrow's framing business for those years to be $9,499, $26,414, and $14,525 respectively[2]. The trial court was understandably skeptical about those figures and commented that they were inconsistent with the size of the marital estate.

Closer examination of the tax returns and further questioning indicated the use of a number of strategies to reduce the parties' tax obligation. Mr. Morrow's business enjoyed revenue that ranged from a low of $178,000 to a high of $534,000 during the years in question. While labor costs consumed most of that money, Mr. Morrow also purchased real property with some of it and deducted the purchase price as a business expense. He also applied accelerated depreciation schedules to the equipment he purchased. Sometimes he bartered his labor for cash or services, and he may have used cash transactions on occasion. Of course, by using his own labor to build the marital home, he was able to increase his net worth without generating any additional taxable income.

A loan application that the parties submitted in 2002 to the Wilson Bank and Trust recited a $56,000 annual income for the parties, with $7,000 - $8,000 attributed to Ms. Morrow. Mr. Morrow testified that he earned about $25 an hour as a framing carpenter, but that rainy or inclement weather imposed an upper limit on the number of days he could work.

At the conclusion of the first day of hearings, the trial court declared that it was granting the divorce to Ms. Morrow. Final decisions on property division, child support and alimony were held

_____

[2]A Social Security Earning Record introduced into evidence was consistent with these figures, and showed that in all his years in the labor force, Mr. Morrow never earned more than $25,600 in taxed Social Security earnings.

in abeyance until the second day of hearings on August 6, in part to allow Mr. Morrow to submit into evidence his 2002 tax return, which had not yet been filed. That return proved to be consistent with the earlier ones, showing revenues of $263,485 for Buddy Morrow Construction, and net profit of $16,093.

At the conclusion of all the proof, the trial court announced its decision from the bench, a decision that was memorialized in its order of September 11, 2003. The court granted the divorce to Ms. Morrow on the ground of the adulterous conduct of Mr. Morrow and ruled that, in light of the length of the marriage and the contributions of both parties to the marital estate, the most equitable division of the property was one that was exactly equal. The court found the total value of the marital property to be $539,768 and awarded each party property worth $269,884.[3]

Mr. Morrow was awarded the duplex, the two lots, the savings account, and all the equipment associated with his business. Ms. Morrow wished to remain in the marital home with the children and was awarded that property. The court placed a lien on the home in favor of Mr. Morrow in the amount of $66,056, to equalize the property division. The amount of the lien was ordered to be paid by July 1, 2007, or earlier if Ms. Morrow sold or refinanced the home.

The court further found Mr. Morrow's annual income to be $36,000 per year or $3,000 per month, and set child support in accordance with the guidelines at $762 per month, with a reduction to $500 per month after the daughter graduates from high school. Mr. Morrow was also ordered to pay Ms. Morrow $214 per month to reimburse her for the children's medical insurance premiums.

The court stated that it was declining Ms. Morrow's request for alimony because of the financial burden that child support placed upon Mr. Morrow and because Ms. Morrow has more education than Mr. Morrow does. The court commented that "I can't see ordering Mr. Morrow to pay alimony for the rest of his life," and declared that Ms. Morrow was capable of finding a better-paying job than the one she had. The court suggested that if Ms. Morrow wished to pursue a nursing degree, she could tap the equity in the marital home for that purpose. The court also ordered Mr. Morrow to pay $5,000 towards Ms. Morrow's attorney fees. Ms. Morrow appealed.

### III. THE PROPERTY DIVISION

Ms. Morrow contends that the trial court erred in several respects in its division of the marital property. She argues that because Mr. Morrow is capable of earning more money than she, she should have been awarded more than half of the marital estate, that the court incorrectly classified several items as Mr. Morrow's separate property, and that the court placed an incorrect value on an Individual Retirement Account that was awarded to Ms. Morrow.

The court is charged with making an equitable division of marital property in divorce cases, without regard to fault and in accordance with the factors set out in Tenn. Code Ann. § 36-4-121(c).

---

[3]The court's calculations incorporated the value of six vehicles and other property subject to division.

An equitable division does not necessarily have to be an equal division. *Robertson v. Robertson,* 76 S.W.3d 337, 341 (Tenn. 2002); *Ellis v. Ellis*, 748 S.W.2d 424, 427 (Tenn. 1988). Rather, it is achieved by considering and weighing the most relevant factors in light of the unique facts of the case. *Tate v. Tate*, 138 S.W.3d 872, 875 (Tenn. Ct. App. 2003); *Batson v. Batson*, 769 S.W.2d 849, 859 (Tenn. Ct. App. 1988). However, there is nothing in the factors or in the guidelines that would preclude a precisely equal division of marital property, if that would indeed produce the most equitable result.

Ms. Morrow asked to be awarded the marital home, and Mr. Morrow opposed that request. Tennessee Code Annotated § 36-4-121 (d) encourages such awards. It states that "[t]he court may award the family home and household effects, or the right to live therein and use the household effects for a reasonable period, to either party, but shall give special consideration to a spouse having physical custody of a child or children of the marriage."

Mr. Morrow was awarded most of the remainder of the marital property, including all the equipment associated with his business, several pieces of property that were acquired in the course of the business, and a bank account that will give him the financial flexibility to continue to pay his employees and to operate his business as a going concern.

Because the marital home represented more than half the total value of the marital estate, the court placed a lien on the home in favor of Mr. Morrow. This was authorized by Tenn. Code Ann. § 36-4-121(e)(2), which reads, "[t]he court may impose a lien upon the marital real property assigned to a party as security for the payment of spouse support or payment pursuant to property division."

## A. SEPARATE AND MARITAL PROPERTY

The first task a court must undertake in dividing property is to classify the property as either marital or separate. Property acquired during the course of a marriage is considered marital property and is subject to division upon the divorce of the parties. Tenn. Code Ann. § 36-4-121(b)(1)(A). Separate property is not subject to division upon divorce. Tenn. Code Ann. § 36-4-121(a)(1); *Tate*, 138 S.W.3d at 876; *Smith v. Smith*, 93 S.W.3d 871, 876 (Tenn. Ct. App. 2002). Included in the definition of separate property is property acquired at any time by a spouse as a gift or bequest. Tenn. Code Ann. § 36-4-121(b)(2)(D). In the case before us, Ms. Morrow asserts that the trial court improperly classified certain items of property.

The trial court awarded a customized truck and a number of family heirlooms to Mr. Morrow as his separate property. Ms. Morrow contended that some of those items should have been considered marital property and some as her own separate property. Mr. Morrow testified that the money to buy the 1964 Ford F-100 pickup truck was a gift to him from his mother and that he customized the truck to such an extent that it was used in several Alan Jackson videos. Ms. Morrow claimed that the mother gave Mr. Morrow the money for the truck as payment for the work he did in fixing up her Florida condominium.

In regard to the family heirlooms, Mr. Morrow claimed that they were given to him by his mother and grandmother. Ms. Morrow claimed that during the last six months of her mother-in-law's life, when Ms. Morrow was helping take care of her, the mother-in-law told Ms. Morrow that she wanted to give her some of those items. Ms. Morrow was not named in Mr. Morrow's mother's will. The trial court ruled that Mr. Morrow was entitled to all such items and Ms. Morrow would receive any items that came from her own family as her separate property.

Since there was conflicting testimony as to the disputed property, the trial court had to resolve the conflicts by weighing the evidence and assigning credibility. We have studied the entire transcript of the divorce hearing, and we conclude that the evidence does not preponderate against the trial court's determination as to those particular pieces of property. In matters of credibility, we give great weight to the trial court's findings.

## B. THE VALUE OF THE WIFE'S IRA

In addition to classifying the property, the trial court must assign values to it in order to make an equitable distribution. Herein, the trial court valued both Ms. Morrow's and Mr. Morrow's IRAs at $8,600, even though the uncontradicted proof showed that Ms. Morrow's was only worth $1,500 at the time of trial. The court noted that both parties had purchased IRAs at the same time, and put equal amounts in both. Mr. Morrow had invested in a money market fund and had enjoyed a modest, but positive, return. Ms. Morrow had invested her IRA in stocks and had suffered large reverses when the stock market slumped. The court reasoned that each party should be compelled to live with the choices made by that party, and simply attributed the same value to both retirement accounts.

There is no dispute that the individual retirement accounts were properly classified as marital property. *See* Tenn. Code Ann. § 36-4-121(b)(1)(A); *Langschmidt v. Langschmidt,* 81 S.W.3d 741, 745-746 (Tenn. 2002); *Miller v. Miller*, 81 S.W.3d 771, 775 (Tenn. Ct. App. 2001). The question is whether the value assigned to Ms. Morrow's IRA is correct. The proof herein established the value of the IRA at the time of the hearing; there was no proof of a different value. We must, consequently, conclude that the evidence preponderates against the valuation assigned by the trial court. The trial court's valuation is in error, and the correct value is $1,500.

The result is that by awarding to Ms. Morrow an asset worth $7,100 less than the value assigned by the court, the court did not award Ms. Morrow half the assets as it declared it intended. Obviously, exactness of equality in distribution is not required. In this case, however, the court required Ms. Morrow to pay Mr. Morrow an amount intended to equalize the property distribution. Because of our resolution of the overall property division issue, no remedy is required to correct the error in valuing the IRA.

## C. EQUITABLE PROPERTY DIVISION

Ms. Morrow asserts that the trial court's division of property was not equitable in view of the financial resources and earning potential of the parties. The primary question presented is whether the trial court's order that Ms. Morrow pay Mr. Morrow $66,000 to exactly equalize the property distribution was equitable under the circumstances. Among the factors to be considered upon which there was proof at trial are (1) the duration of the marriage; (2) the vocational skills, employability, and earning capacity of each of the parties; (3) the relative ability of each of the parties for future acquisitions of capital assets and income; and (4) the economic circumstances of each party at the time of the property division. Tenn. Code Ann. § 36-4-121(c). Any other relevant factors can be considered in dividing the property "in proportions as the court deems just." Tenn. Code Ann. § 36-4-121(a)(1).

Based on the record, we think it is highly unlikely Ms. Morrow will be able to accumulate $66,000 by the date established by the court. Her choices, then, would be to sell the house or get a mortgage on it for the amount due Mr. Morrow. Based on her current salary, it is questionable whether she can meet her living expenses much less also pay a mortgage payment. As discussed below, Ms. Morrow has considered further training that would increase her earning capability.

It is clear that Ms. Morrow's earning ability and ability to accumulate assets is less than that of Mr. Morrow. Her economic circumstances are worse than his because, although she was awarded the most significant marital asset, it is encumbered by the lien placed on it by the trial court and it costs money to maintain it. Mr. Morrow was awarded the parties' liquid assets and the items that allow him to continue producing income without encumbering additional debt.

In order to determine whether the economic disadvantage Ms. Morrow is under should be remedied by a modification of the property division, we must also consider any potential for alimony. The two are related. Although trial courts are directed to divide the parties' property prior to determining whether and how much spousal support to award, Tenn. Code Ann. §36-4-121(a)(1), and although the amount of separate and marital property awarded a spouse is one of the factors to be considered in making an alimony determination, Tenn. Code Ann. § 36-5-101(d)(1)(H), both property distribution and spousal support awards can be used to address the needs of an economically disadvantaged spouse.

> We encourage trial courts to use the division of marital property to assist in meeting the disadvantaged spouse's financial needs when feasible. *See Crabtree*, 16 S.W.3d at 361 n.4 ("In cases in which there is a disparity between the relative earning capacities of the parties, a trial court also may consider adjusting the award of marital assets to assist the disadvantaged spouse."); *see also Renfro v. Renfro*, 848 P.2d 830, 834 (Alaska 1993) (establishing a preference for meeting the parties' needs with the division of marital property, rather than with alimony). Section 36-4-121 of the Tennessee Code Annotated does not require an equal division of marital property but an equitable division. Tenn. Code Ann. § 36-4-121(a)(1); *see Ellis*, 748 S.W.2d at,

427. When practical, therefore, a trial court should consider awarding more assets to an economically disadvantaged spouse to provide future support, rather than relying solely upon an award of alimony. When there are few marital assets but a considerable amount of marital debt, a trial court should similarly consider awarding a disadvantaged spouse a lesser amount of marital debt. Careful distribution of the marital property may assist the disadvantaged spouse in achieving rehabilitation in furtherance of the legislative policy of eliminating spousal dependency.

*Robertson*, 76 S.W.3d at 341.

Therefore, whether the trial court's distribution herein should be modified to achieve equity in view of Ms. Morrow's economic disadvantage depends in part upon consideration of the factors and issues relevant to spousal support. Consequently, we must consider the issues surrounding Ms. Morrow's request for spousal support.

## IV. ALIMONY

Ms. Morrow argues that the trial court erred in refusing to award her any alimony. Mr. Morrow argues to the contrary that the trial court correctly concluded that Ms. Morrow's share of the marital property and the educational level she achieved prior to marriage eliminates the need for any form of spousal support.

Pursuant to Tenn. Code Ann. § 36-5-101(a)(1)(A), courts have discretion to order "suitable support and maintenance of either spouse by the other spouse . . . according to the nature of the case and the circumstances of the parties. . . ." There are no hard and fast rules for spousal support decisions, such determinations require a careful balancing of the relevant factors, and the determinations hinge on the unique facts of each case. *Robertson*, 76 S.W.3d at 341. In determining whether to award support and the nature, amount and length of such support, the court is to consider all relevant factors, including those enumerated in Tenn. Code Ann. § 36-5-101(d)(1). *Id.*

Among the factors to be considered by the courts in making spousal support decisions, the two considered to be the most important are the disadvantaged spouse's need and the obligor spouse's ability to pay. *Bratton v. Bratton*, 136 S.W.3d 595, 604 (Tenn. 2004); *Robertson*, 76 S.W.3d at 342; *Bogan v. Bogan*, 60 S.W.3d 721, 730 (Tenn. 2001). The statutory factors to be considered include the relative earning capacity, obligations, needs, and financial resources of each party; the relative education and training of each party; the ability and opportunity and necessity of each party to secure such education and training in order to improve such party's earning capacity to a reasonable level; and the assets of each party, whether they be separate assets or marital property awarded in the divorce. Tenn. Code Ann. § 36-5-101(d)(1)(E).

Where economic disadvantage exists, the legislature has expressed a preference for rehabilitative alimony over long-term, open-ended alimony *in futuro* where rehabilitation is feasible. Tenn. Code Ann. § 36-5-101(d)(1)(C); *Bratton*, 136 S.W.3d at 605; *Robertson*, 76 S.W.3d at 339-40;

*Burlew v. Burlew*, 40 S.W.3d 465, 470 (Tenn. 2001). The purpose of an award of rehabilitative alimony is to encourage divorced spouses to become self-sufficient. *Robertson,* 76 S.W.3d at 339-40; *Burlew*, 40 S.W.3d at 471, *Crabtree v. Crabtree,* 16 S.W.3d 356, 360 (Tenn. 2002). A grant of "rehabilitative, temporary support and maintenance" where the spouse is economically disadvantaged, Tenn. Code Ann. § 36-5-101(d)(1)(C), may assist the disadvantaged spouse in obtaining further education or training or may also provide temporary income to support the disadvantaged spouse during the post-divorce economic adjustment. *Robertson*, 76 S.W.3d at 340-41.

In determining whether a disadvantaged spouse can be rehabilitated with short-term support, the court is to consider "every relevant factor." *Bratton*, 136 S.W.3d at 604; *Robertson*, 76 S.W.3d at 340. The legislature has provided a definition to be applied to determine whether rehabilitation is feasible. "To be rehabilitated means to achieve, with reasonable effort, an earning capacity that will permit the economically disadvantaged spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties." Tenn. Code Ann. § 36-5-101(d)(1)(C).

In addition, the legislature has also provided guidance where the parties, like the ones herein, agreed during the marriage that one of them would pursue a career and the other would primarily focus his or her efforts on the family.[4] Tenn. Code Ann. § 36-5-101(d)(1)(A) and (B) now provide:

> (d)(1)(A) Spouses have traditionally strengthened the family unit through private arrangements whereby one (1) spouse focuses on nurturing the personal side of the marriage, including the care and nurturing of the children, while the other spouse focuses primarily on building the economic strength of the family unit. This arrangement often results in economic detriment to the spouse who subordinated such spouse's own personal career for the benefit of the marriage. It is the public policy of this state to encourage and support marriage, and to encourage family arrangements that provide for the rearing of healthy and productive children who will become healthy and productive citizens of our state.

> (B) The general assembly finds that the contributions to the marriage as homemaker or parent are of equal dignity and importance as economic contributions to the marriage. Further, where one (1) spouse suffers economic detriment for the benefit of the marriage, the general assembly finds that the economically disadvantaged spouse's standard of living after the divorce should be reasonably comparable to the standard of living enjoyed during the marriage or to the post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties.

---

[4]These amendments became effective in June of 2003, and a corrected bill was signed in August, before the entry of the final order herein.

In the case before us, Ms. Morrow, with Mr. Morrow's agreement, chose not to be employed for some years and then to take employment that would allow her more time with the children and to take care of family needs. While she had an associates degree, she did not pursue a career utilizing that degree and has not reaped the economic benefits of long term and increasingly responsible employment. Consequently, she qualifies as a spouse who has suffered economic detriment for the benefit of the marriage. The legislature has made it clear that in this situation her post-divorce standard of living should be reasonably comparable to that enjoyed during the marriage or to the post-divorce standard of Mr. Morrow.

There is not always a practical way to achieve the stated goal because the resources required to maintain two households are obviously greater than those required to maintain one. We interpret the legislature's goal to mean the courts should attempt to equalize, as much as is practical, the adverse economic impact of divorce on the parties.

With that goal in mind, we note that while Mr. Morrow received a bank account worth over $75,000 in the property division, Ms. Morrow was awarded very little in the way of cash or liquid assets. She also was not awarded any income-producing property. She did receive the marital home, which was unencumbered by a mortgage, but was still subject to property taxes, insurance, and the expenses of maintenance and upkeep, as well as Mr. Morrow's lien.

As we noted earlier, Ms. Morrow's current salary is too low to allow her to approach Mr. Morrow's standard of living. The trial court apparently believed that Ms. Morrow's two-year degree would enable her to find work that was much more remunerative than the $7.63 per hour she earned working for the Wilson County Board of Education. The only proof to support such a belief was testimony that Ms. Morrow's cousin, Scott Hicks, might be willing to hire her to work in his insurance office at a salary of $16,000 a year. There is nothing in the record to indicate that Ms. Morrow's stale credentials would enable her to earn anything near the $25 per hour that Mr. Morrow could earn as a framing carpenter or the amount of income he can generate through his building company and income producing investments.

Ms. Morrow is interested in earning a nursing degree. If she were to become a licensed practical nurse, her earning capacity would improve. If she were to become registered nurse, she would probably be able to achieve an earning capacity comparable to Mr. Morrow's. The record contains a Catalog and Student Handbook from the Tennessee Technological Center at Hartsville, which offers a one-year L.P.N. program at a very reasonable cost. There was testimony that licensure as an R.N. would take two years of study at a different institution, but no evidence as to the cost of such a program. The trial court commented that "if she really wants to go into this nursing, well there's going to be money in that house."

Ms. Morrow was forty-four years old at the time of trial, and is in good health. While her age and condition do not preclude a new career for her, the useful duration of such a career would necessarily be much shorter than it would have been if she had sought the necessary training immediately after finishing her associates degree, rather than after twenty-four years of marriage.

Ms. Morrow might be able to finance a nursing degree or some other educational option by mortgaging or selling her house. In order to seriously undertake such an enterprise, Ms. Morrow would have to reduce her working hours considerably and still come up with tuition money, living expenses, and the costs of maintaining a home, while facing the payment to Mr. Morrow ordered by the trial court.

The trial court has broad discretion in matters of alimony. *Aaron v. Aaron*, 909 S.W.2d 408, 410 (Tenn.1995); *Self v. Self*, 861 S.W.2d 360, 361 (Tenn. 1993). We are not inclined to alter a trial court's decision as to alimony unless it is not supported by the evidence or is contrary to the public policy embodied in the applicable statutes. *Brown v. Brown*, 913 S.W.2d 163, 169 (Tenn. Ct. App. 1994).

Ms. Morrow is economically disadvantaged compared to Mr. Morrow. To approach his earning potential, she needs additional training. We believe the aggregate effect of the trial court's property division and denial of alimony is contrary to the public policy established by the legislature because it does not facilitate Ms. Morrow's economic rehabilitation. The goal of such determinations is to allow the disadvantaged spouse to become self-sufficient. *Manis v. Manis*, 49 S.W.3d 295, 299 (Tenn. Ct. App. 2001). We fail to see how Ms. Morrow can attain that goal without an award of rehabilitative alimony, a modification of the property division, or both.

In view of the Tennessee Supreme Court's directive in *Robertson*, we conclude that the legislative policies are best furthered in this case by modifying the trial court's property division to eliminate the $66,056 payment to Mr. Morrow. Without that obligation and the accompanying lien on the asset she was awarded, Ms. Morrow can make choices about her financial future without a large debt hanging over her and independent of any reliance on Mr. Morrow or his income. At the same time, Mr. Morrow will not be encumbered by alimony payments to Ms. Morrow and can make his own choices for the future without a continuing obligation.

Accordingly, we modify the property distribution by reversing the award to Mr. Morrow of $66,056[5] and vacate the lien placed upon the marital home to secure that payment. Having made that modification, we see no need to alter the trial court's ruling as to alimony.

## V. ATTORNEY FEES

The trial court ordered Mr. Morrow to pay $5,000 towards Ms. Morrow's attorney fees, leaving the balance of almost $5,000 to be paid by Ms. Morrow. Ms. Morrow argues on appeal that this was insufficient, and that Mr. Morrow should have been ordered to pay all her attorney fees. An award of attorney fees is within the sound discretion of the trial court, and will not normally be reversed or modified unless there has been abuse of that discretion. *Aaron*, 909 S.W.2d at 411; *Storey v. Storey,* 835 S.W.2d 593, 597 (Tenn. Ct. App.1992).

---

[5]Technically, because of the error in the trial court's valuation of Ms. Morrow's IRA, the payment would have been $58,956.

An award of attorney fees in a divorce case is considered to be alimony *in solido*. *Kinard v. Kinard*, 986 S.W.2d 220, 235 (Tenn. Ct. App.1998); *Herrera v. Herrera*, 944 S.W.2d 379, 390 (Tenn. Ct. App. 1996 ). Thus, when determining whether to award attorney fees, the trial court must consider the same factors that are used when considering a plea for alimony. *Yount v. Yount*, 91 S.W.3d 777, 783 (Tenn. Ct. App. 2002); *Kincaid v. Kincaid*, 912 S.W.2d 140, 144 (Tenn. Ct. App. 1995). We have discussed those factors earlier in this opinion, but reiterate that the most important factor to consider in alimony decisions is the need of the obligee spouse. *Eldridge v. Eldridge*, 137 S.W.3d 1, 24 (Tenn. Ct. App. 2002); *Watters v. Watters*, 22 S.W.3d 817, 821 (Tenn. Ct. App.1999).

In accord with general alimony considerations, "[a]n award of attorney's fees is proper when one spouse is disadvantaged and does not have sufficient resources with which to pay attorney's fees." *Herrera*, 944 S.W.2d at 390. *Lancaster v. Lancaster*, 671 S.W.2d 501, 503 (Tenn. Ct. App. 1984). "Such awards are appropriate when the spouse seeking them lacks sufficient funds to pay his or her own legal expenses or would be required to deplete his or her resources in order to pay these expenses." *Smith v. Smith*, 984 S.W.2d at 610.

Recently, the Supreme Court reaffirmed that an award of attorney's fees "is conditioned upon a lack of resources to prosecute or defend a suit in good faith . . ." and that such an award is to ensure access to the courts. *Langschmidt*, 81 S.W.3d at 751, quoting *Fox v. Fox*, 657 S.W.2d 747, 749 (Tenn. 1983). Consequently, a spouse with adequate property and income is not entitled to an award of additional alimony to compensate for attorney's fees and expenses. *Lindsey v. Lindsey*, 976 S.W.2d 175, 181 (Tenn. Ct. App. 1997); *Duncan v. Duncan*, 686 S.W.2d 568, 573 (Tenn. Ct. App. 1984). If a party has adequate property and income, or is awarded adequate property in the divorce, from which to pay his or her own expenses, an award of attorney's fees may not be appropriate after consideration of all relevant factors. *Wilder v. Wilder*, 66 S.W.3d 892, 895 (Tenn. Ct. App. 2001); *Koja v. Koja*, 42 S.W.3d 94, 98 (Tenn. Ct. App. 2000); *Houghland v. Houghland*, 844 S.W.2d 619, 623-24 (Tenn. Ct. App. 1992); *Ingram v. Ingram*, 721 S.W.2d 262, 264 (Tenn. Ct. App. 1986). The award of attorney's fees as additional alimony is most appropriate where the divorce does not provide the obligee spouse with a source of funds, such as from property division, with which to pay his or her attorney's fees. *Yount*, 91 S.W.3d at 783. Additionally, if a spouse receives alimony as a result of the divorce and will be forced to deplete those funds, designed to sustain that spouse, just in order to pay attorney's fees, an award of fees is appropriate. *Batson*, 769 S.W.2d at 862.

When assessing the needs and resources of the parties, the court may consider not only the relative values of each party's property post-divorce, *see* Tenn. Code Ann. § 36-5-101(d)(1)(G) and (H), but also whether or not a party has been left with sufficient liquid assets to pay an attorney. *Eldridge*, 137 S.W.3d at 25; *Gilliam v. Gilliam*, 776 S.W.2d 81, 87 (Tenn. Ct. App. 1988); *Luna v. Luna,* 718 S.W.2d 673, 676 (Tenn. Ct. App. 1986).

In the present case, the property division left Ms. Morrow with a valuable piece of property, but little or no liquid assets. Because Ms. Morrow was economically disadvantaged and had few resources with which to pay fees, it was appropriate for the court to order Mr. Morrow to pay some

of that cost.  The question is whether the court should have ordered that he assume a greater portion of the expense in view of the financial condition of each party.

It is an unfortunate fact of divorce that both parties usually incur substantial attorney fees, and the economic detriment that both suffer in the forced restructuring of their financial affairs is worsened by this additional obligation.  In the present case, although Ms. Morrow lacks liquid assets and immediate earning potential, she was awarded the most valuable marital asset.  In view of all the circumstances, including our modification of the property division, we conclude the trial court acted within its discretion in the award of fees.

## CONCLUSION

We modify the trial court's order to award Ms. Morrow the marital home unencumbered by the lien in favor of Mr. Morrow and reduce the award of property to Mr. Morrow by eliminating the $66,056 payment to him from Ms. Morrow.  Otherwise, the order of the trial court is affirmed.  The costs on appeal are taxed to the appellee, Gordon E. Morrow, Jr.

_____
PATRICIA J. COTTRELL, JUDGE